**WHITE, Appellant,**

v.

**MOUNT CARMEL MEDICAL CENTER, Appellee.**

[Cite as *White v. Mt. Carmel Med. Ctr.,* 150 Ohio App.3d 316, 2002-Ohio-6446.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–381.

Decided Nov. 26, 2002.

Lancione & Schwart, LLC, and C. Jay Schwart, for appellant.

Littler & Mendelson, PC, James M.L. Ferber and Michael A. Womack, for appellee.

_____

Brown, Judge.

{¶ 1} Elise White, plaintiff-appellant, appeals from a judgment of the Franklin County Court of Common Pleas granting a motion for summary judgment filed by Mount Carmel Medical Center ("Mount Carmel"), defendant-appellee.

{¶ 2} Appellee is a hospital located in Columbus, Ohio, and is a self-insured employer for the purposes of administering workers' compensation claims. Appellant began working for appellee on October 16, 1995, as a part-time mammographer and became a full-time employee on June 9, 1996. Thereafter, appellant began working in appellee's mobile mammography unit, operating a van containing a motorized mammography unit and performing mammographies at various locations. In September 1998, appellant resigned from appellee to take another job; however, she returned to appellee on November 22, 1998, and resumed her previous duties.

{¶ 3} On January 6, 1999, appellant slipped on ice while operating the mobile unit and sustained a wrist injury. On that same date, appellee approved appellant's request for medical leave of absence. In an operative note for the January 12, 1999 surgical procedure, the injury was diagnosed as a comminuted distal radial fracture with significant dorsal comminution. Appellant filed a workers' compensation claim with appellee, a self-insured employer, indicating that she had sustained a wrist fracture. On January 26, 1999, appellee certified

appellant's claim for "Fracture, right wrist." It also approved various surgeries, treatments, and physical therapy.

{¶ 4} On March 4, 1999, Dr. Karl Kumler indicated in his treatment notes that appellant's wrist fracture was progressing well and that he had a "slight concern" of possible reflex sympathetic dystrophy ("RSD"). He also indicated that he was concerned about appellant's hand function due to finger stiffness and referred her to a hand therapist. He completed a C–9 Form and returned it to appellee. The form indicated, among other things, that appellant had finger swelling. On March 11, 1999, Tammy Riggenbach, a certified hand therapist, opined that appellant may have RSD. On March 12, 1999, Riggenbach wrote a letter to Dr. Kumler, appellant's treating physician, indicating that she believed that appellant had RSD relating to her wrist injury and suggested that Dr. Kumler to consider using stellate ganglion block injections ("blocks" or "block injections") to arrest the RSD. Riggenbach also related to Dr. Kumler that such injections would be complicated by the fact that appellant had vagal response, which may cause a person to go into shock when pricked with needles.

{¶ 5} In a March 15, 1999 C–9 statement, Dr. Kumler requested that stellate ganglion blocks be permitted to arrest the RSD. Appellee denied any treatment of blocks. Riggenbach claims that appellee told her that the claim was denied because RSD was a pre-existing condition. On March 18, 1999, Riggenbach prepared a report for Dr. Kumler, and appellee expressing her concern that RSD was denied on the basis of a pre-existing condition. Riggenbach also expressed that appellant's hand was not functional due to pain and RSD symptoms. On March 19, 1999, Riggenbach spoke with Charlene Cordle at Mount Carmel East regarding RSD literature she could provide to Patricia Rutter, supervisor of appellee's Employee Health Services. Apparently, a record of the heated conversation was made, and Riggenbach was told by her supervisor that a complaint had been made regarding the conversation.

{¶ 6} On March 22, 1999, Dr. Kumler requested in a C–9 that appellee allow the RSD in appellant's workers' compensation claim and authorize consultations for appellant with Dr. Claire Wolfe and Dr. Scott Berliner to diagnose RSD. On that same day, appellee approved consultations with Drs. Wolfe and Berliner. Appellee claims that it denied the allowance of RSD as part of appellant's workers' compensation claim because no test or doctor had ever diagnosed RSD.

{¶ 7} On March 24, 1999, Dr. Berliner, an anesthesiologist, examined appellant. Dr. Berliner issued a report to Dr. Kumler and appellee indicating that appellant had signs of autonomic instability and block injections may be used to see whether her sympathetic system was playing a role in her symptoms.

{¶ 8} On April 1, 1999, appellant had a consultation with Dr. Wolfe. Dr. Wolfe authored a report to Dr. Kumler and appellee, in which she opined that

there was "no question" that appellant had RSD and indicated that there was a real possibility of loss of major function if not treated aggressively. Dr. Wolfe also stated that the most consistent diagnostic test for RSD was a triple-phase bone scan. She also indicated that she believed such a test was not necessary, as appellant's clinical picture was so classic and dramatic. Further, she believed that appellant should be given the option to receive block injections.

{¶ 9} Appellee's Human Resources Policies and Procedures Manual ("manual") contains a leave of absence policy, under which an employee may take a maximum of twenty-six weeks of medical leave, which includes twelve weeks' leave under the Family Medical Leave Act. In April 1999, appellee maintains that it began to prepare for appellant's return to work after the twenty-six-week medical leave by attempting to find temporary modified duty work for appellant. Appellee sent appellant's treating physicians forms requesting that they indicate appellant's work restrictions. The doctors never responded.

{¶ 10} On April 7, 1999, appellee wrote a letter to appellant requesting that she undergo a triple-phase bone scan consistent with Dr. Wolfe's report. Appellee indicated that after receiving the results of the scan, it would determine whether to allow RSD as part of the workers' compensation claim. Appellant did not undergo the triple-phase bone scan, citing as her reason her vagal response and the invasiveness of the procedure.

{¶ 11} On April 12, 1999, appellant's counsel sent a letter and fax to appellee indicating that appellant was in dire need of block injections. On April 13, 1999, appellee approved one block injection from Dr. Berliner in order to diagnose RSD. His report after the April 20, 1999 block was inconclusive, but appellee approved two more blocks on April 26, 1999. On May 5, 1999, Dr. Kumler requested an undefined number of block injections due to appellant's good response to the previous three, which appellee denied. However, appellee did approve three additional blocks.

{¶ 12} On May 7, 1999, appellant filed a motion with the Industrial Commission of Ohio ("commission") to have her workers' compensation claim allowed for the additional conditions of RSD and right frozen shoulder syndrome. Also, on May 7, 1999, Sheila Harris, manager for appellee's Employee Health Services, wrote to Dr. Kumler explaining that she was trying to find temporary modified duty work for appellant and asking him for appellant's work restrictions.

{¶ 13} On May 12, 1999, appellee informed appellant that all further treatments would be put on hold pending a commission decision. Appellant then contacted her private health insurance carrier, Holy Cross Insurance ("Holy Cross") and requested further block injections. Appellee also claims that it informed Holy Cross that appellant may need additional blocks and that it would reimburse Holy Cross if the RSD and blocks were allowed by the commission.

Holy Cross approved appellant's request on May 13, 1999. Appellant received three more block injections.

{¶ 14} On June 22, 1999, appellant underwent an examination by Dr. John Cunningham at the request of appellee. Dr. Cunningham issued a report on that date opining that appellant had sustained right hand, arm, and shoulder RSD as a result of the January 6, 1999 accident. He stated that the three additional blocks since March 1999 were appropriate.

{¶ 15} On July 20, 1999, after twenty-six weeks of leave, appellant had not returned to work, had not requested extended leave, and had not contacted appellee to announce when she would return to work. On August 27, 1999, Mary Kelley, director of Human Resources for appellee, sent appellant a letter terminating her employment, citing that she had exhausted her leave and had not provided a return-to-work date. Appellant advised appellee that she deemed the termination a violation of the workers' compensation anti-retaliation statute and explained the various attempts from her doctors to communicate her return-to-work dates. On September 27, 1999, appellee sent a letter to appellant telling her that Riggenbach had advised that she could return to some nature of work on September 16, 1999, and advised her that it would look into a job for her.

{¶ 16} During the summer of 1999, appellant alleges that she discussed with supervisors in appellee's Women's Health Center various jobs she might have been able to perform relating to mammography. The only mammography-related job she thought she could perform was bone-density testing, and she requested employment performing bone-density tests. However, appellee told her that it had no position that exclusively performed such testing. In September and October 1999, appellee offered appellant three jobs: nuclear medicine technologist at Mount Carmel West, radiographer at Mount Carmel East, or radiographer at St. Ann's Hospital. Appellant declined the offers because she was not certified to do the nuclear medicine job, and the other jobs required the use of two hands. Appellant told Dr. Lori Sullivan that she still thought she could do bone-density testing, and Dr. Sullivan noted such on C-84 and C-9 forms she sent to appellee. Appellant alleges that appellee told its employees in its Women's Health Center not to discuss their jobs with appellant and told them to advise appellant that all job discussions would be conducted through the Human Resources Department. Appellee later advised appellant that there were no bone-density jobs available.

{¶ 17} Subsequently, on October 14, 1999, the commission allowed RSD as an additional condition but denied right frozen shoulder syndrome. After RSD was allowed, appellee authorized every RSD treatment request and paid such treatment bills. In addition, from January 1999 to June 2000, appellee paid $999 to

appellant every two weeks for temporary total disability compensation with regard to her workers' compensation claim.

{¶ 18}  On February 23, 2000, appellant filed an action against appellee, alleging (1) wrongful termination in violation of R.C. 4123.90 (the Ohio workers' compensation anti-retaliation statute); and (2) an employer's intentional tort claim for appellee's intentional, malicious, and bad-faith conduct in denying, delaying, suspending, and interrupting appellant's treatment and for appellee denying, delaying, and appealing the orders of the allowance of RSD. In June 2000, appellant was released to return to full-time employment, and on June 28, 2000, she began full-time employment with Ohio State University as a mammographer with modified lifting requirements.  On April 16, 2001, appellee filed a motion for summary judgment.  Appellant filed a memorandum contra on May 8, 2001.  On May 15, 2001, appellee filed a reply and motion to strike appellant's affidavit submitted with her memorandum contra.  On March 7, 2002, the trial court issued a decision and entry granting (1) appellee's motion for summary judgment and (2) appellee's motion to strike appellant's affidavit.  Appellant appeals from the trial court's judgment, asserting the following three assignments of error:

{¶ 19}  "[1.] The trial court erred to the prejudice of appellant, by employing facts proffered solely by the party moving for summary judgment (appellee), in its analysis of the facts of the case, to support granting appellee summary judgment.

{¶ 20}  "[2.] The trial court erred in granting appellee summary judgment by finding that appellee did not violate Revised Code § 4123.90, the workers compensation anti-retaliation statute, when the facts demonstrate that appellee took punitive action against appellant as a direct result of appellant pursuing her workers' compensation claim.

{¶ 21}  "[3.] The trial court erred in holding that an employer's intentional tort, under the *Balyint [v. Arkansas Best Freight Sys., Inc.* (1985), 18 Ohio St.3d 126, 18 OBR 188, 480 N.E.2d 417] theory, is limited to situations wherein a self-insured employer suspends payment of compensation to an injured worker."

{¶ 22}  Appellant argues in her first assignment of error that the trial court relied solely upon the facts proffered by appellee, to the exclusion of the facts proffered by her.  Appellant claims that the trial court's ignoring her version of the facts was apparent by its order, in which the facts she proffered were rarely, if ever, discussed.  However, this court reviews a trial court's entry of summary judgment de novo.  *Wille v. Hunkar Laboratories, Inc.* (1998), 132 Ohio App.3d 92, 96, 724 N.E.2d 492.  Because this court makes an independent review of the record and does not rely upon the order of the trial court, the trial

court's factual recitation, whether complete or incomplete, is not prejudicial to appellant. Therefore, this assignment of error is overruled. Nevertheless, in conducting our analysis under her other assignments of error, we will take note of the evidence appellant contends that the trial court disregarded, as well as all other evidence in the case.

{¶ 23} Appellant argues in her second assignment of error that the trial court erred in granting appellee summary judgment when it found that appellee did not violate R.C. 4123.90, the anti-retaliation statute, when the facts demonstrated that appellee took punitive action against appellant as a direct result of appellant's pursuing her workers' compensation claim. Pursuant to Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383.

{¶ 24} Appellant argues in her brief that her R.C. 4123.90 retaliation claim is based upon appellee's (1) denial of and/or delay in approving her medical treatment, (2) failure to immediately notify the commission that it was contesting the medical treatment and allowance issues, (3) unilateral suspension of all treatment in appellant's workers' compensation claim following the filing of her motion for the additional allowance of the RSD and right frozen shoulder syndrome, and (4) termination of her employment.

{¶ 25} Initially, appellee argues, as it did in the trial court, that the court should not address the theories set forth in (1), (2), and (3) above because appellant's complaint alleged that her R.C. 4123.90 cause of action was based solely on her discharge. Appellee points out that appellant never filed a motion to amend her complaint to raise these new claims, and, thus, she waived the right to assert the new conduct that she now claims as a basis for the R.C. 4123.90 claim. Appellant's complaint sets forth her cause of action under R.C. 4123.90 as:

{¶ 26} "47. Defendant, as a direct and proximate result of Plaintiff's filing and pursuing her workers' compensation claim, discharged and terminated her employment relationship with Defendant.

{¶ 27} "48. Plaintiff, as a direct and proximate result of Defendant's wrongful termination of Plaintiff's has suffered damages as described in Revised Code Section 4123.90."

{¶ 28} Thus, it is clear that appellant's complaint did not raise the reasons listed in (1), (2), and (3) as possible grounds of recovery under R.C. 4123.90. Her complaint lists only her termination and discharge as a reason for recovery. As a result, appellee's motion for summary judgment did not address these issues and addressed only the R.C. 4123.90 claim as it related to appellant's discharge. Our review of the record reveals that the first time appellant raised these new theories of recovery under R.C. 4123.90 was in her memorandum contra appellee's motion for summary judgment. In its reply memorandum, appellee urged the trial court to disregard these new arguments raised for the first time in appellant's memorandum contra. In its March 7, 2002 decision and entry, the trial court did not directly address the issue. Instead, the trial court failed to reach the merits of these newly raised claims by finding that there was no precedent for allowing a cause of action under R.C. 4123.90 for allegedly punitive actions by an employer in the handling of an employee's workers' compensation claim. Thus, the trial court found that the only conduct actionable was appellant's termination from employment.

{¶ 29} Civ.R. 8(A) sets forth the necessities for pleading a claim for relief and provides in relevant part: "A pleading that sets forth a claim for relief * * * shall contain (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled." The purpose of Civ.R. 8(A) is to give the defendant fair notice of the claim and an opportunity to respond. *Fancher v. Fancher* (1982), 8 Ohio App.3d 79, 82–83, 8 OBR 111, 455 N.E.2d 1344. We are mindful that Civ.R. 8(A) does not require the plaintiff to plead the legal theory of recovery. *Illinois Controls, Inc. v. Langham* (1994), 70 Ohio St.3d 512, 639 N.E.2d 771, paragraph six of the syllabus. We also recognize that the plaintiff is not " 'bound by any particular theory of a claim but that the facts of the claim as developed by the proof establish the right to relief.' " Id. at 526, 639 N.E.2d 771, quoting McCormac, Ohio Civil Rules Practice (2d Ed.1992) 102, Section 5.01.

{¶ 30} This court is permitted to affirm a trial court's decision on different grounds. See 5 Ohio Jurisprudence 3d (1999), Appellate Review, Section 585. In affirming the trial court's decision that appellant may not recover under the grounds delineated in (1), (2), and (3) above, we find that appellant's complaint failed to give appellee fair notice of the claim and an opportunity to fully respond. Appellant could not fairly raise these new reasons underlying her R.C. 4123.90 claim for the first time in her memorandum contra. Appellant's complaint was filed on February 23, 2000. Her memorandum contra was not filed until May 9, 2001. The record reveals no indication during that fifteen-month period that appellant was seeking recovery under R.C. 4123.90 for any reason other than her termination. It would be inequitable to allow her to

untimely raise these new arguments at that late juncture without first amending her complaint or, at a minimum, raising the issues in some other pleading or form. This is particularly true in light of the fact that the discovery cutoff was March 31, 2001. Thus, appellee would have been unable to conduct any further discovery to investigate these new grounds under R.C. 4123.90. As indicated above, the purpose of Civ.R. 8(A) is to give a defendant fair notice of the claim and an opportunity to respond. We do not believe that appellant's complaint or subsequent pleadings allowed appellee fair notice of the claim and an equitable opportunity to respond to the new grounds set forth in (1), (2), and (3) above. Therefore, although we agree with the trial court that appellant may not recover based upon these grounds under R.C. 4123.90, we find so for a different reason.

{¶ 31} Thus, we are left with the only ground stated in appellant's complaint for her cause of action under R.C. 4123.90; that is, that appellee's termination of her employment was in retaliation for her filing a workers' compensation claim. R.C. 4123.90 states, in part:

{¶ 32} "No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer."

{¶ 33} As this court explained in *Sidenstricker v. Miller Pavement Mainte-nance, Inc.* (Oct. 25, 2001), Franklin App. No. 00AP–1146, 2001 WL 1286419:

{¶ 34} "The basic purpose of workers' compensation is to protect and provide a remedy for employees injured in the course of their employment. Section 35, Article II, Ohio Constitution; *Bailey v. Republic Engineered Steels, Inc.* (2001), 91 Ohio St.3d 38, 40–41 [741 N.E.2d 121]; *Village v. Gen. Motors Corp., G.M.A.D.* (1984), 15 Ohio St.3d 129, 133 [15 OBR 279, 472 N.E.2d 1079]; *Guy v. Arthur H. Thomas Co.* (1978), 55 Ohio St.2d 183, 186 [9 O.O.3d 138, 378 N.E.2d 488]. To accomplish that purpose, the workers' compensation legislation balances the rights and duties of employers and employees by striking a bargain between them.

{¶ 35} "As part of the 'balance,' employer participation in the workers' compensation system is generally compulsory, and participating employers must comply with the provisions of the Workers' Compensation Act. R.C. 4123.01(B)(2). One provision of the Act, R.C. 4123.90, statutorily embodies a clear public policy that employers not retaliate against employees who exercise their statutory right to file a workers' compensation claim or pursue workers' compensation benefits. *Bryant* [*v. Dayton Casket Co.* (1982), 69 Ohio St.2d 367], 371, 374 [23 O.O.3d 341, 433 N.E.2d 142]; *Boyd* [*v. Winton Hills Med. & Health Ctr., Inc.* (1999), 133 Ohio App.3d 150], 161 [727 N.E.2d 137]; *Vince v. Parma Comm. Gen. Hosp.* (Jan. 21,

1988), Cuyahoga App. No. 53180 [1988 WL 5165], unreported ('The laudable objective of this provision is that employees may not be intimidated from recovering for their injuries by the fear of reprisals by their employer, up to and including discharge from employment'). If an employer does retaliate against an employee by discharging the employee for filing or pursuing a workers' compensation claim, R.C. 4123.90 provides a basis for the employee to bring an action for retaliatory discharge.

{¶ 36} "The scope of the statute is nevertheless narrow, and R.C. 4123.90 does not prevent an employer from discharging an employee who is unable to perform his or her duties. Employees who have filed for workers' compensation benefits may be discharged for just and lawful reasons. The statute protects only against termination in direct response to the filing or pursuit of a workers' compensation claim. *Markham* [*v. Earle M. Jorgensen Co.* (2000), 138 Ohio App.3d 484], 493 [741 N.E.2d 618]; *Russell v. Franklin Cty. Auditor* (Sept. 28, 1999), Franklin App. No. 98AP–1502, unreported [2000 WL 798144], citing *Barker v. Dayton Walther Corp.* (1989), 56 Ohio App.3d 1, 3 [564 N.E.2d 738]."

{¶ 37} To support a claim for retaliatory discharge, a plaintiff must show that (1) she engaged in a protected activity, (2) she was the subject of an adverse employment action, and (3) a causal link existed between the protected activity and the adverse action. See *Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div.* (1994), 99 Ohio App.3d 396, 650 N.E.2d 950, citing *Jackson v. RKO Bottlers of Toledo, Inc.* (C.A.6, 1984), 743 F.2d 370, 375. If the plaintiff meets her initial burden in establishing a prima facie case, then the burden shifts to the defendant to give a legitimate nondiscriminatory reason for the action. See id., citing *Burrus v. United Tel. Co.* (C.A.10, 1982), 683 F.2d 339, 343. If the defendant gives a nondiscriminatory reason, then the plaintiff must show that the articulated reason was only a pretext for the adverse action. See id. This court has applied the foregoing analysis to R.C. 4123.90 claims. *Oliver v. Wal–Mart Stores, Inc.,* Franklin App. No. 02AP–229, 2002-Ohio-5005, 2002 WL 31111841; *Sidenstricker,* supra.

{¶ 38} In the present case, assuming arguendo that appellant has established a prima facie case, appellee has sustained its burden of articulating a legitimate, nonretaliatory reason for its termination of appellant. Appellee premised its summary judgment motion on its having terminated appellant's employment because appellant was absent from work for a period of time longer than allowed under appellee's medical-leave policy. Appellee supported its motion with the deposition of appellant, the affidavit of Patricia Rutter, the affidavit of Sheila Harris, and the affidavit of Mary Kelley. Harris averred that

she had sent correspondence to Dr. Kumler, explaining that appellee wanted to find temporary modified-duty work for appellant to perform and asking Dr. Kumler to advise her of appellant's work restrictions. She averred that she received no response from Dr. Kumler and no definitive return-to-work date. She attached the letter she had sent to Dr. Kumler as an exhibit to her affidavit.

{¶ 39}  Kelley averred in her affidavit that under appellee's leave of absence policy, set forth in Section 745.0 of its human resources manual, appellee's employees are allotted a maximum of twenty-six weeks of leave. She indicated that if an employee exceeds the maximum of twenty-six weeks of leave, appellee's policy is to terminate his or her employment. Kelley further averred that on August 27, 1999, she sent a letter to appellant terminating her employment for exceeding her twenty-six weeks of leave and for failing to provide a definitive return-to-work date. In addition, Kelley stated that from 1999 to 2000, approximately nineteen other employees were terminated for exceeding their allotted twenty-six weeks of leave. Kelley attached as an exhibit to her affidavit the letter she sent to appellant.

{¶ 40}  Appellant testified in her deposition that appellee explained to her that she had a total leave period of twenty-six weeks. She said she did not recall if she ever had any conversations with appellee regarding extending the leave beyond twenty-six weeks, but she knows she never actually requested that her leave be extended beyond the twenty-six weeks. Appellant also specifically indicated that her employment was terminated because she had exhausted the twenty-six weeks of leave, and her doctors had not supplied a return-to-work date. In her deposition, she never indicated any other reason for the termination when provided an opportunity:

{¶ 41}  "Q. * * * Other than the expiration of your 26 weeks of leave and the fact that your doctor had not supplied a return-to-work date, are you aware of any other reasons for your termination from Mt. Carmel?

{¶ 42}  "A. No."

{¶ 43}  Appellant also testified that Drs. Kumler, Cunningham, and Sullivan provided return-to-work dates. However, she indicated that the return-to-work dates were all estimated. She further stated that she could not return to work on the dates they estimated due to the nonfunctionality of her hand. She admitted that there was no point in time when she gave appellee a definitive date that she could return to work. We also note that this court, as well as the trial court, could only find the June 10, 1999 report from Dr. Kumler in the record, and such did not provide a definitive return-to-work date, indicating only a return to "some kind" of employment in the "near future."

{¶ 44}   R.C. 4123.90 "does not prevent an employer from discharging an employee who is unable to perform his duties; it merely prevents an employer from discharging an employee because the employee pursues a workers' compensation claim." *Barker v. Dayton Walther Corp.* (1989), 56 Ohio App.3d 1, 3, 564 N.E.2d 738. "If the company policy is neutral in its application, the correlation between the timing of the discharge and the claim is not sufficient to meet the burden of proof." *Metheney v. Sajar Plastics, Inc.* (1990), 69 Ohio App.3d 428, 432, 590 N.E.2d 1311.   As a result, an employee's termination under an employer's medical leave policy is not considered a retaliatory discharge if the company policy is neutral in its application.   Id.

{¶ 45}   In the present case, even if appellant's evidence sets forth a prima facie case under R.C. 4123.90, appellee's evidence presented a neutral reason for terminating appellant's employment.   In her deposition, appellant stated that she was never able to go back to her prior job and indicated that the return-to-work dates were all estimated.   She stated that no doctor had ever told her that in his or her opinion, she could return to being a full-time mammographer.   She further acknowledged that she could not return to work on the various dates they estimated due to the nonfunctionality of her hand.   She admitted that there was no point in time when she gave appellee a definitive date that she could return to work.   The evidence establishes that she could not return to full-time employment until June 2000, when her hand became functional enough to perform her duties as a mammographer.   Because appellant did not return to work, her absence from the workplace exceeded the time allowed under appellee's medical-leave policy, and appellee terminated her employment.   A bona fide company policy prohibiting long-term absences or excessive absenteeism rebuts the inference that an employee who violates the policy was terminated for retaliatory motives. *Vince v. Parma Comm. Gen. Hosp.* (Jan. 21, 1988), Cuyahoga App. No. 53180, 1988 WL 5165.

{¶ 46}   Because we have found that appellee articulated a legitimate nonretaliatory reason for its action, appellant could only escape summary judgment by showing that appellee's proffered reason was a mere pretext.   Appellant responds with various arguments.   Appellant first maintains that the conduct, omissions, and decisions of appellee relating to her workers' compensation claim were what caused or greatly contributed to her extended absence from work.   However, appellant fails to demonstrate that this was true.   Appellant cites no evidence showing that her condition worsened or was exacerbated by appellee's handling of her claim.   Appellant also does not demonstrate that appellee's actions in suspending her medical treatment during its contest of her claim contributed to her failure to return to work within twenty-six weeks.   To the

contrary, appellant admits that she continuously received treatment for her injury, even while appellee was contesting the allowance of her claim.

{¶ 47} Appellant also claims that appellee acted to prevent her from timely returning to work by quashing the conversations between her and Women's Health Center, by not offering sedentary substitute work, and solely limiting its job offers to jobs that required extensive use of both hands. However, appellee's efforts at finding suitable substitute work for appellant beginning in April 1999 would tend to demonstrate that it did not seek to terminate appellant's employment based upon the filing of her claim. Such interest in finding substitute work was apparent in its letter to Dr. Kumler requesting that he provide appellant's work restrictions. Further, it is undisputed that even after terminating appellant's employment, appellee continued to try to find employment for appellant. There is no evidence that these efforts were not genuine. Evidence that the employer offered an injured worker a number of substitute assignments when the employee was medically able to return to work has been found to weaken any inference of retaliatory conduct under R.C. 4123.90. *Markham*, supra, at 493, 741 N.E.2d 618. In addition, even if appellant's allegations are true that appellee told its employees at the Women's Health Center not to discuss their job descriptions with appellant and to advise her that all job discussions would be conducted through the Human Resources Department, such is not evidence that appellee attempted to keep appellant from returning to work. Rather, such instructions would be reasonable, given that the Human Resources Department would be better able to describe the necessary job qualifications and available positions.

{¶ 48} Appellant also maintains that the undocumented allegation that nineteen other employees of appellee were terminated was not sufficient to remove any discriminatory pretext in appellee's decision to terminate appellant. She asserts that appellee should have been required to prove that the nineteen other employees were on leave of absence for similar reasons and that the leave of absence policy was the sole reason for its termination of appellant. However, Kelley, as director of Human Resources for appellee, specifically testified that these nineteen employees were terminated for the exact same violation of the leave policy. She testified to such based upon her personal knowledge, and appellant gives no reason as to why such information should not be admissible. Further, the reason for the leave of absence of the nineteen employees is largely irrelevant. We need only determine that the leave of absence policy was applied universally and nondiscriminatorily to appellant and these nineteen employees regardless of the reason for their leaves of absence. It has been held that an affidavit of a human resources manager containing examples of ten employees who had been disciplined under the company's policy on absenteeism, most of

whom had absences that were not the result of injuries covered by workers' compensation, demonstrated a legitimate nonretaliatory basis for appellant's discharge. See *Boggs v. Conrad* (Sept. 27, 1999), Mahoning App. No. 98 CA 120, 1999 WL 783952.

{¶ 49} Appellant's claim that the September 1999 offers of employment were not reasonable or genuine because they were clearly beyond her physical abilities is unsupported by the record. As noted previously, appellee received no response from Drs. Kumler and Sullivan regarding any work restrictions. Further, although vague, Drs. Kumler and Cunningham did indicate that appellant would be able to return to work at the end of summer or early fall. Riggenbach indicated that appellant would be able to return to work in September 1999. Thus, appellee had very little medical support regarding appellant's work restrictions, and what vague information it could gather from the medical evidence seemed to indicate that appellant would be able to return to employment in the fall of 1999.

{¶ 50} Because appellant's evidence does not show that appellee's reason for terminating appellant's employment is pretext, she has failed to meet her burden under R.C. 4123.90. See *Bianco v. Trumbull Mem. Hosp.* (July 13, 2001), Trumbull App. No. 2000-T-0126, 2001 WL 799942 (violation of leave policy not a pretext when employee had completed a six-month leave of absence, yet failed to return to work on the appointed date and failed to provide the necessary forms that would have allowed for an extension of her leave of absence, while also indicating to employer that she was still under restrictions and would be unable to resume prior duties). Even construing the evidence most strongly in favor of appellant, we find that there are no genuine issues of material fact as to appellant's claim for retaliatory action based upon R.C. 4123.90. Therefore, the trial court properly granted appellee's summary judgment motion in that respect. Appellant's second assignment of error is overruled.

{¶ 51} Appellant argues in her third assignment of error that the trial court erred in holding that she was not entitled to recovery for her employer's intentional tort under *Balyint v. Arkansas Best Freight Sys., Inc.* (1985), 18 Ohio St.3d 126, 18 OBR 188, 480 N.E.2d 417. In her complaint, appellant claims that the following wrongful and illegal acts of appellee formed the basis of a *Balyint* claim: (1) appellee wrongfully and intentionally refused to additionally recognize her workers' compensation claim for RSD, and (2) appellee intentionally and wrongfully refused to provide appellant with immediate, appropriate, and necessary medical treatment.

{¶ 52} We first note that, just as appellant did with regard to her cause of action under R.C. 4123.90, appellant raised several additional grounds for recovery under *Balyint* in her memorandum contra appellee's motion for sum-

mary judgment that were not set forth in her complaint. In addition to the grounds delineated in her complaint and set forth above, appellant raised in her memorandum contra that she was entitled to recovery under *Balyint* on the following grounds: (1) appellee's denial of her claim for RSD on the basis that said condition was a "pre-existing condition"; (2) appellee's unreasonable delay in requesting the bone scan diagnostic test from March 4 or 15, 1999 to April 7, 1999; and (3) appellee's termination of appellant's employment. In its decision, the trial court did not address these three additional arguments propounded for the first time in appellant's memorandum contra. As we found with respect to appellant's second assignment of error above, appellant's belated raising of such grounds was prejudicial to appellee. We are mindful that even if a complaint neither contains allegations on a legal theory nor suggests or intends to advance that theory, the complaint may still be sufficient if it "contain[s] allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at *trial.*" (Emphasis sic.) *Fancher,* supra, at 82, 8 OBR 111, 455 N.E.2d 1344. In the present case, however, appellee could not have been fairly expected to infer that appellant was going to claim entitlement to recovery under *Balyint* based upon the three wholly different grounds raised in her memorandum contra. Appellant's late revelation of such grounds in her memorandum contra did not give appellee a fair opportunity to respond to such and conduct any additional discovery and investigation that may have been necessary. Therefore, as the trial court did, we will address only the two grounds raised in the complaint under the cause of action pursuant to *Balyint.*

{¶ 53} In *Balyint,* an employee asserted a claim against his employer alleging that the employer negligently, wantonly, recklessly, intentionally, willfully, maliciously and arbitrarily terminated his temporary total disability compensation. The employer filed a Civ.R. 12(B)(6) motion to dismiss on the grounds that the employee failed to comply with R.C. 4123.90. The Ohio Supreme Court concluded that R.C. 4123.90 was not an exclusive remedy and that the employee could select the remedy best calculated to afford the greatest recovery. Id. at 129–130, 18 OBR 188, 480 N.E.2d 417. One other such remedy was an intentional tort action. Id. at 129, 18 OBR 188, 480 N.E.2d 417. The court defined intentional tort as " 'an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur.' " Id. at 128, 18 OBR 188, 480 N.E.2d 417, quoting *Jones v. VIP Dev. Co.* (1984), 15 Ohio St.3d 90, 472 N.E.2d 1046, paragraph one of the syllabus. Accordingly, the court in *Balyint* held that "[a]n employee of a self-insured employer may maintain a cause of action against the employer for the intentional and wrongful termination of workers' compensation payments." *Balyint,* supra, at syllabus.

{¶ 54} Appellant's specific contentions are (1) claims under *Balyint* are not limited to situations in which a self-insured employer suspends payment of compensation to an injured worker, but also include situations where a self-insured employer rejects an allowance and suspends all medical treatment; and (2) claims under *Balyint* are not limited to instances of intentional acts, but additionally include acts done in bad faith.

{¶ 55} It appears that there is case law to support appellant's proposition that acts done in bad faith may form the basis for a *Balyint* claim. See *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 94, 652 N.E.2d 671 (addressed a claim under *Balyint* that a self-insured employer acted in bad faith in the course of administering and resisting employee's workers' compensation claims); *Hall v. Marion Power Shovel, Inc.* (1992), 78 Ohio App.3d 23, 603 N.E.2d 427 (Marion County Court of Appeals addressed a claim under *Balyint* that a self-insured employer acted in bad faith as a result of active malice, fraud, or insult as employee's insurer in contesting his claim for benefits before the commission, thereby delaying treatment and benefits that were ultimately awarded to him).

{¶ 56} However, we find that based upon the reasoning in *Kokitka* and *Hall*, appellant can show no genuine issue of material fact demonstrating that she is entitled to relief pursuant to *Balyint*. In *Kokitka*, an employee was awarded temporary total disability payments, but such payments legally ceased after she returned to work. The employee argued that, under *Balyint*, her employer acted in bad faith in failing to continue to pay temporary total compensation beyond such period. The Ohio Supreme Court found no obligation ever arose to pay an employee for a second, separate period of temporary total disability as no order to make such payments was ever made. Based upon this, the Ohio Supreme Court found no cause of action was tenable under *Balyint* because, unlike *Balyint*, the actions of the employer in *Kokitka* were permitted by law, and therefore did not rise to the level of bad faith.

{¶ 57} In *Hall*, an employee was injured in the course of his employment with his self-insured employer and thereafter received temporary total disability benefits, which were eventually terminated. Nine months later, the employee's treating physician recommended that he undergo further surgery, but the employer refused to approve the surgery and recommence temporary total disability benefits. Although the employee eventually underwent surgery and received all requested workers' compensation benefits, he brought an action against his employer under *Balyint*, alleging that his claims were unreasonably delayed and that he had suffered resulting financial ruin because of the employer's lack of good faith in processing his claims. The employee contended that the employer had no legal basis or good-faith justification for contesting his request for surgery and temporary total disability benefits and that the employer's

actions were for the sole purpose of delay. On appeal after summary judgment was granted to the employer, the court found *Balyint* clearly distinguishable from the cause before the court because no legal duty on the part of the present employer had yet occurred. The court stated that there could be no bad faith because the employer did not do anything that was not permitted by law or the dictates of the Workers' Compensation Act and the Industrial Commission's administrative rules.

{¶ 58} In the present case, we find *Balyint* distinguishable for the same reasons explained in *Kokitka* and *Hall*. In the current case, at the time appellee allegedly acted in bad faith in the handling of appellant's claim, no duty to make any payments on the part of appellee had yet occurred. Appellee's duties commenced only as of the date the commission allowed the additional claim for RSD. Further, we find, as did the courts in *Kokitka* and *Hall*, that because appellee acted in accordance with the law, its actions did not constitute "bad faith." For the sake of completeness, we will address appellant's arguments regarding her various allegations of bad faith individually.

{¶ 59} With regard to her argument that appellee acted in bad faith in refusing to additionally recognize her workers' compensation claim for RSD, we find it unsupported by the evidence presented. Appellant argues that there was a "unanimity" of medical opinions that appellant suffered from RSD as a direct result of her right wrist fracture. Appellant points to numerous pieces of evidence to demonstrate that appellee rejected her allowance of RSD in bad faith: (1) Dr. Kumler's March 4, 1999 office notes that indicate he believed appellant had RSD; (2) appellee's reference material used in researching medical conditions, the Milliman & Robertson Healthcare Guidelines, which indicates that when symptoms persist after one month of therapy, the caregiver should consider RSD; (3) the March 12, 1999 report of Riggenbach, appellant's hand therapist, sent to Dr. Kumler, in which Riggenbach stated that appellant demonstrated all four of the cardinal signs of RSD and that stellate block injections should be considered immediately; (4) the March 15, 1999 C–9 statement of Dr. Kumler in which he indicates that appellant should undergo block treatments to arrest RSD; (5) Riggenbach's report on March 18, 1999 expressing great concern for RSD's being denied; (6) Riggenbach's March 19, 1999 telephone call to Charlene Cordle at Mount Carmel East urging appellee to approve treatment for RSD; (7) Dr. Kumler's C–9 on March 22, 1999, requesting recognition of RSD; (8) Dr. Berliner's March 24, 1999 report, in which he opined that appellant had signs of autonomic instability and expressing hope that his report would help get approval for blocks; and (9) Dr. Wolfe's April 1, 1999 report, in which she stated that there was no question that appellant had RSD and that there were diagnostic tests that could be done to establish the presence of RSD, the most consistent test being a

triple-phase bone scan, but such a test was totally unnecessary as "proof" of RSD because the clinical picture was so classic and dramatic.

{¶ 60} We see no genuine issue of material fact as to any bad faith in appellee's refusal to allow RSD until the commission approved such. With regard to Dr. Kumler's March 4, 1999 office note, we agree with appellee that this office note clearly does not diagnose RSD and does express some equivocation as to whether appellant suffered from RSD. He indicated a "slight concern" of "possible" RSD, while also indicating that the swelling did not show the smooth red skin that is typically seen with RSD. Further, although the Milliman & Robertson Healthcare Guidelines may have explained the risk of RSD for those who suffer complex bone fractures, certainly they do not establish that appellant necessarily suffered from RSD. Also, the Milliman & Robertson Healthcare Guidelines indicate that RSD is an "uncommon" complication of a fracture and that confirmation of RSD is through a bone scan, which appellant never underwent.

{¶ 61} With regard to Dr. Kumler's March 15, 1999 C–9 report, Dr. Kumler stated that he was "concerned" regarding RSD. This can hardly constitute a diagnosis of RSD. He also did not request the allowance of RSD in the March 15, 1999 C–9; rather, he requested only block injections. As to Dr. Kumler's March 22, 1999 request to allow RSD, appellee presented the testimony of Patricia Rutter. Her testimony was that this request was denied because no test had ever diagnosed RSD prior to the request, and she had no medical record from any doctor conclusively diagnosing such. Rutter also testified that she did not have Dr. Kumler's March 22, 1999 office notes, which included an assessment of RSD, at the time she made the decision to deny the allowance. Clearly, Ohio Adm.Code 4123–19–03(I)(5) and (K)(5) permit appellee to reject a claim for benefits that is not supported by proper medical evidence. Also, nowhere in Dr. Berliner's March 24, 1999 report did he diagnose RSD. Despite appellant's claim that Sheila Harris testified in her deposition that she believed Dr. Berliner's March 24, 1999 note confirmed RSD, Harris, in fact, did not indicate the note to which she was referring and admitted that she was not the primary administrator in appellant's claim. Further, Dr. Berliner himself explicitly testified in his deposition that prior to April 28, 1999, he was not certain appellant had RSD. Further, although Riggenbach did express her opinion several times that appellant had the classic symptoms of RSD, Riggenbach is not a licensed physician, and appellee could not rely on her diagnosis. See Ohio Adm.Code 4123–5–18(A) (compensation shall not be approved by the commission in a claim unless supported by a report of a physician duly licensed to render medical treatment).

{¶ 62} Dr. Wolfe's April 1, 1999 office note caused appellee to request that appellant undergo a bone-scan test to conclusively diagnose RSD. Although

Dr. Wolfe did opine that appellant had RSD, appellee was certainly permitted to request that appellant take the diagnostic test that Dr. Wolfe suggested for the first time on April 1, 1999. Appellee timely requested that appellant take such test on April 7, 1999, but appellant refused such scan because it was an invasive procedure and she had vagal response. Any such delay after that point cannot be attributed to bad faith by appellee, given appellee's reasonable desire to have some diagnostic evidence of RSD. Evidence was presented that RSD can worsen rapidly without aggressive treatment. Thirty-three days elapsed from the first mention of RSD by Dr. Kumler on March 4, 1999, until appellee requested the bone scan on April 7, 1999. The relatively short period involved mitigates against any bad faith in appellee's handling of appellant's request for an additional allowance of RSD. For the foregoing reasons, we find that there is no genuine issue of material fact as to any bad faith in appellee's refusal to allow RSD.

{¶ 63} Appellant next argues that appellee, in bad faith, refused to provide appellant with immediate, appropriate, and necessary medical treatment. The first instance specifically cited by appellant is appellee's failure to timely and appropriately provide block injection treatments from March 4, 1999 to April 20, 1999, after all medical opinions and the Milliman & Robertson Healthcare Guidelines delineated that such treatment should be instituted. On March 12, 1999, Riggenbach indicated that appellant may have RSD and advised Dr. Kumler to consider using block injections to arrest the RSD. On March 22, 1999, Dr. Kumler's request for block injections was denied. Rutter testified that the injections were denied because there had been no test or diagnosis of RSD by a doctor. However, after Dr. Wolfe's April 1, 1999 report, appellee did approve one block injection on April 13, 1999, for diagnostic purposes. Appellant was given the block injection on April 20, 1999. Because appellant tolerated the injections well and because the results were inconclusive, appellee then approved two more, which appellant received on April 28 and May 5, 1999. On May 5, 1999, Dr. Kumler requested unlimited blocks, which appellee denied. However, appellee approved three blocks and requested an independent medical examination. On May 7, 1999, appellant filed a motion with the commission to allow RSD as an additional claim. At that time, appellee stated that all further treatments, including block injections, would be put on hold pending the commission's decision. Rutter testified that she then called Holy Cross and informed them that they had denied the claim but that there may be additional requests for block injections. Rutter told Holy Cross that if Holy Cross paid for more block injections and the commission eventually allowed the claim, appellee would reimburse Holy Cross for the block injections. Dr. Berliner completed three more block injections on May 14, May 20, and June 4, 1999.

{¶ 64} Considering the evidence discussed above, we find that there is no genuine issue of material fact as to any bad faith by appellee in denying the block injections. As explained above, appellee denied unlimited block injections from March 4 to April 20, 1999, due to the absence of a diagnosis of RSD by any doctor or test. Despite this fact, appellee did approve one treatment for diagnostic purposes during this period. We simply have no evidence of bad faith in denying the claim, and appellant fails to point us toward any. Appellee has presented a good-faith basis for denying unlimited block injections during this period. Therefore, this argument is without merit.

{¶ 65} The second instance specifically cited by appellant to demonstrate bad faith in delaying her medical treatment is appellee's termination of all treatment in appellant's claim five days after appellant filed her motion for the allowance of RSD with the commission. However, we find no genuine issue of material fact as to bad faith. Appellee, as a self-insured employer, is not required to make payment of compensation or medical benefits for an additional condition until the commission allows the condition. Ohio Adm.Code 4123–19–03(K)(5) and (K)(7). Further, appellant's argument implies that she could receive no treatment during this period. Appellee suspended only the payment of such treatment while it contested the claim, as it may legally do. Appellant specifically testified in her deposition that she visited Dr. Kumler once per month from March until June 1999. She also testified that she had daily hand therapy with her therapist, Riggenbach, from March until August 1999. Additionally, she received numerous block injections after appellee informed her that it would not pay for further medical treatments.

{¶ 66} Although appellant seems to make some argument that appellee suspended all treatment, including therapy related to her original, allowed injury, she fails to explain what treatment she had been receiving that was solely related to the allowed condition and unrelated to RSD. Further, as discussed above, Rutter testified that she informed Holy Cross that there may be further medical treatment for which it would reimburse Holy Cross if the additional claim for RSD were allowed. Thus, appellant knew that, through some source, her medical bills for further treatment were going to be paid, and she continued to receive proper medical treatment. Appellee was legally permitted to cease payment for this while the RSD claim was pending with the commission. Appellee made arrangements with Holy Cross regarding payment and reimbursement. This court finds that appellant has failed to raise a genuine issue of material fact that appellee exhibited bad faith in terminating payments for treatments related to her nonallowed condition pending the commission's decision.

{¶ 67} Having reviewed the record, we agree with the trial court's determination that no genuine issue of material fact exists on the issue of appellee's bad

faith in handling appellant's workers' compensation claim. There is no evidence that appellee, other than by the normal and legal course of events, caused any delays in bad faith. See *Hall,* supra, at 27, 603 N.E.2d 427. We find no evidence in the record suggesting that appellee intentionally violated Ohio's workers' compensation laws, acted in bad faith, or otherwise failed to pay appellant's medical bills or approve a claimed condition without reasonable justification. Accordingly, we overrule appellant's third assignment of error.

{¶ 68} Accordingly, appellant's three assignments of error are overruled, and judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

PETREE and PEGGY BRYANT, JJ., concur.