**Dunrick YETTS, Plaintiff,**

v.

**ITW–NIFCO, INC., Defendant.**

**No. Civ.A. 2:98–CV–343.**

United States District Court,
S.D. Ohio,
Eastern Division.

June 3, 1999.

Dennis M. McGuire, Columbus, OH, for Dunrick Yetts, plaintiff.

Douglas Michael Kennedy, Columbus, OH, for ITW–Nifco Inc., defendant.

## OPINION AND ORDER

KING, United States Magistrate Judge.

This is an action in which plaintiff, who is African–American, alleges that his employment was terminated on account of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5. Plaintiff also asserts supplemental state law claims of race discrimination under O.R.C. § 4112.02, .99, and discharge in violation of Ohio's public policy because it was done in retaliation for having filed a workers' compensation claim. The complaint seeks monetary damages. With the consent of the parties, 28 U.S.C. § 636(c), the matter has been referred to the undersigned for disposition. This matter is now before the Court on defendant's motion for summary judgment.

Summary judgment is appropriate if the record establishes that there exists no genuine issue of material fact. Rule 56, F.R.Civ.Pro. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 251. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Plaintiff was hired by defendant in September 1994. After several promotions, he achieved the rank of Millwright II and assigned to the maintenance department. Plaintiff's employment was terminated on March 17, 1997. While plaintiff claims that his termination was a function of race discrimination and retaliation for having filed a workers' compensation claim, defendant contends that plaintiff was terminated because of "repeated instances of insubordination." *Defendant's Motion for Summary Judgment,* at 1.

### I. Claims of Race Discrimination.[1]

■ Title VII makes it an unlawful employment practice for any employer to terminate or otherwise discriminate against an employee on account of the employee's race. 42 U.S.C. § 2000e–2. An employee who believes that he was disciplined in his employment, by termination or otherwise, on account of his race, may present either circumstantial evidence sufficient to create an inference of discrimination, or direct evidence of discrimination. *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1246 (6th Cir.1995). Although plaintiff's memorandum in opposition to the motion for summary judgment addresses only the standards applicable to a case based on circumstantial evidence, he also presents, by way of affidavit, direct evidence of a racial animus on the part of certain agents of the defendant. The Court will therefore analyze plaintiff's claims of race discrimination, and the motion for summary judgment, by reference to the standards applicable to both forms of evidence.

#### 1. Circumstantial Case

■ Plaintiff may establish a *prima facie* circumstantial case under Title VII by showing that 1) he belongs to a racial minority and 2) "for the same or similar

---

**1.** The evidentiary standards and burdens of proof applicable to an employment discrimination claim under Title VII are also applicable to an employment discrimination claim under R.C. Chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Commit. v. Ohio Civil Rights Comm'n.,* 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

conduct, he was treated differently than similarly-situated non-minority employees." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir.1992). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In this regard, the plaintiff must establish that the comparable, non-minority employees were "similarly-situated in all respects," *Mitchell, supra*, 964 F.2d at 583, and that the comparable employees were engaged in misconduct of "comparable seriousness." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Mitchell, supra*, 964 F.2d at 583 n. 5; *Stotts v. Memphis Fire Dept.*, 858 F.2d 289, 296 (6th Cir.1988). Accordingly,

> the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subjected to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of it.

*Mitchell, supra*, 964 F.2d at 583.

 If the plaintiff establishes a *prima·facie* case, the defendant employer is presumed, as an initial matter, to have violated Title VII. To overcome this presumption, the defendant must "articulate a legitimate, non-discriminatory reason for the plaintiff's [termination]." *Talley, supra*, 61 F.3d at 1246. If the defendant employer carries its burden, the burden then shifts back to the plaintiff to prove that unlawful discrimination was "a determinative factor in his termination." *Id.* *See also Harrison v. Metropolitan Gov't. of Nashville and Davidson Cy., Tenn.*, 80 F.3d 1107, 1115 (6th Cir.), *cert. denied*, 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996).

The parties agree that plaintiff, as an African–American, is a member of a class protected by Title VII. It is also undisputed that plaintiff was terminated from his employment with the defendant. Moreover, defendant does not appear to take the position that plaintiff was not qualified for the position of Millright II. Instead, plaintiff's circumstantial case of race discrimination appears to turn on the requirement that at least one similarly-situated, non-minority employee was treated more favorably than was plaintiff.

Defendant takes the position that plaintiff was terminated because of a number of confrontations and altercations with other company employees of the company and a violation of company safety policies and procedures. *Defendant's Motion for Summary Judgment*, at 3, 5. Plaintiff takes the position that white employees had engaged in similar misconduct but were not terminated from employment. In reply, defendant argues that these employees were not similarly-situated to plaintiff and that they did not engage in misconduct of comparable seriousness to that engaged in by plaintiff.

The Court finds that plaintiff's own testimony on deposition is most relevant to the resolution of this portion of defendant's motion for summary judgment. Plaintiff testified that, from July to December 1996, he was assigned to "Cell 1,"[2] the cell leader for which was Richard Lester. *Plaintiff's Depo.*, 30. Effective January 1997, the assembly machines were assigned to Cell 2. *Id.*, at 81. Because plaintiff was "the main man to service those machines," *Id.*, plaintiff was also assigned to Cell 2, the cell leader for which was Michael McCullough. *Id.*, 32. Cell leaders worked only the first shift. *Id.*, 31. Supervisors were assigned to the various shifts.[3] Plaintiff worked a modified second shift schedule which allowed him to either work another job or attend college. Because his shift was modified and overlapped first shift, he could consult with his

---

**2.** Apparently, defendant's various departments were referred to as "cells."

**3.** Plaintiff testified that he reported directly to his cell leader, rather than to any supervisor.

*Plaintiff's Depo.*, 31. Larry Thompson, the production manager at the time, testified that the floor supervisors had authority over even

cell leader at the beginning of plaintiff's shift. *Id.*

Plaintiff's deposition testimony demonstrates that plaintiff was involved in a number of confrontations with his fellow employees. In July 1996, plaintiff was involved in an incident with Edgel Charles, a maintenance associate. *Id.*, 27. Plaintiff, who had been working with a grinder, left for a ten minute break. While he was gone, Charles locked the grinder in a tool cabinet. *Id.*, 33–34. Plaintiff believed that this was done "just to—piss me off." *Id.*, 35. Plaintiff told Charles,

> I just basically told Edgel that I was fed up with the little games that they were playing and it was time for us to, you know, take this issue up with Larry Thompson.

*Id.*, 34–35. Thompson, the manufacturing manager at the time, counseled plaintiff that he should talk to Thompson before confronting his fellow employees. *Id.*, 40.[4]

In October that same year, plaintiff was injured on the job and was transported to the hospital. Abe Jones, the second shift supervisor, went to transport plaintiff from the hospital back to the plant so he could go home. On the way back from the hospital, Jones, who—like plaintiff—is African–American, *Id.*, 49–50,[5] wanted to stop for something to eat; plaintiff didn't feel well and objected. *Id.*, 46. Against plaintiff's wishes, Jones stopped at three different fast-food restaurants:

> And just being frustrated with the situation, I grabbed the wheel and said, "Hey. What are you doing?" I said, "Take me back to the plant."
>
> And at that point he just put the truck in park while it was still moving, got out

of the ... truck and was heading around the front end of the truck toward ... the passenger side where I was sitting. So me knowing that he, you know, he was pretty pissed off and like he was coming to attack me, you know, I got out of the truck to defend myself, to run, you know.

I know that he carries a tool that has a knife, screwdrivers, you know. It's very dangerous. I don't know what state of mind that this person—you know, he already thinks that he is above the law to begin with. So I got out of the truck to defend myself. And he—he—when I got out of the truck, he stops, runs back around on the driver's side and jumps into the truck, locks the doors, and looks at me and smiles and drives off.

So there I am, out in the cold with no coat because I was immediately taken to the hospital. No coat. Away from the plant about a mile, mile-and-a-half or so.... I'm in the middle of McDonald's parking lot so I have no other choice but to start to walk back to the plant.

\* \* \* \* . \* \*

So I'm walking back to the plant. And I'm about halfway there. And Jones comes back around and he says, "Come on. Get in the truck."

\* \* \* \* \* \*

And so after, you know—he asks me four or five times. I said, "Look, Jones. I'm not getting back in the truck with you. I'm just going to walk back to the plant. And we will deal with this matter when I get there."

*Id.*, 47–49.[6] On October 25, 1996, Richard Lester, plaintiff's cell leader, issued

maintenance personnel such as plaintiff. *Thompson Depo.*, 19.

4. *Plaintiff's Deposition Exhibit* A appears to be Thompson's memorandum to plaintiff's personnel file following this incident. Plaintiff testified on deposition that he had never seen that memorandum prior to the deposition. Accordingly, the Court will not consider the memorandum.

5. Although plaintiff refers to Jones as "a white employee," in his memorandum *contra* the motion for summary judgment, *Memorandum contra,* at 3, plaintiff actually testified on deposition that Jones is African–American. *Plaintiff's Deposition,* 49–50.

6. The "knife" referred to by plaintiff in his deposition was a "multi-purpose tool," *Id.,* 51, used by Jones at work. Jones did not

plaintiff a written warning for violation of safety rules and company policies or procedures arising out of this incident. *Plaintiff's Deposition Exhibit* B. The warning expressly provided that plaintiff might be dismissed should a similar incident recur. Plaintiff testified on deposition that he "took full responsibility for—for what I did because no matter what, you know, I did jeopardize the safety of Abe as well as the safety of company property." *Plaintiff's Deposition*, at 54.

Plaintiff also acknowledged that his performance evaluation for 1996, *Plaintiff's Deposition Exhibit* C, noted that "Rick has had four confrontation[s] with four different people in the past six months," and that this behavior was "unacceptable." *Id.* On the last page of that evaluation, plaintiff wrote: "I believe I should only be cited for three of the four confrontations referenced in the 'Cooperation/Teamwork' and 'Professional Appearance' sections. The 4th confrontation cited with Mark Chickey was not my fault, in my opinion. . . ." *Id.*

In February 1997, plaintiff received yet another warning, this time from the safety engineer. *Plaintiff's Deposition Exhibit* D; *Plaintiff's Deposition*, 73. Plaintiff was suspended for a violation of "lockout/tagout" procedures and was warned that dismissal would result from any recurrence. *Id.*[7]

Plaintiff acknowledged on deposition that he had argued with Abe Jones, "on several occasions," *Id.* 93. In addition to the October 1996 incident during the return trip from the hospital, plaintiff and Jones had a disagreement on March 7, 1997 over a work assignment. Jones reported to Mike McCullough, plaintiff's cell

leader at the time, that plaintiff had refused Jones' directive to work on a particular machine and had called Jones "a stupid motherfucker." *McCullough Depo.*, 27 – 29. One week later, on March 13, 1997, Jones handed plaintiff his paycheck, in response to which plaintiff "told him to never put his hands on my paycheck again." *Plaintiff's Depo.*, 98.[8] Plaintiff explained that, until then, he had always requested and received his paycheck from other supervisors. He did not trust Jones to actually deliver the paycheck in light of their "bad relationship." *Id.*, 100.

Jones called McCullough and reported that plaintiff had again used profanity towards him, which plaintiff denied. *Id.*, 100–01. McCullough sent plaintiff home with the observation that there would be further discussion of the matter. *Id.*, 101.

Plaintiff also testified that he told McCullough, and later Thompson, that he wanted a change in his assignment "because of the problems that had already started and what it was leading to. And I also told Mike that if I don't get out of that cell, then eventually one of us is . . . going to end up not being there." *Id.*, 102–03. Thompson asked plaintiff if he could work days, which plaintiff declined because he was attending school. *Id.*, 103.

When he returned to work the following Monday, plaintiff was met by Thompson and Kaye Fisher, of the Human Services Department, and handed a termination notice, *Plaintiff's Deposition Exhibit* E., *Plaintiff's Deposition*, 104, which listed as cause, "Repeated confrontations with company associates despite recent warnings." *Plaintiff's Deposition Exhibit* E.

---

threaten plaintiff in any way with the tool. *Id.*, 52.

**7.** The violation referred, apparently, to power disconnection procedures on equipment prior to work on the machine. *Id.*, 74. Although plaintiff was not responsible for the initial violation, he was charged with not checking for compliance with the procedure prior to working on the machine. Plaintiff disagreed

with the charge. *See Plaintiff's Deposition Exhibit* D.

**8.** Plaintiff specifically denied that he told Jones to "keep your fucking hands off my paycheck." *Plaintiff's Deposition*, 98. Abe Jones testified that plaintiff said, "[k]eep your MF hands off my check and anything else I have in this company. . . ." *Deposition of Abraham E. Jones*, 38.

Mike McCullough, plaintiff's cell leader, testified on deposition that he had recommended to Larry Thompson that plaintiff's job be terminated because plaintiff "refused to do his job." *McCullough Depo.*, 35.[9] Larry Thompson, who did not have actual authority to terminate plaintiff's employment, also recommended that plaintiff be terminated. He explained his decision:

> [Plaintiff] was unable to get along with some other people that he worked around, and I believe the confrontations there, they just couldn't be resolved.

*Thompson Depo.*, 34. Thompson made it clear that it was the repeated nature of the confrontations that was determinative: "One incident to me was somebody disagreeing [and] wouldn't have been enough to just flat out terminate somebody." *Id.*, 36. Thompson explained:

> I think [plaintiff's] inability to get along with, one, probably supervision, and other people, confrontations that he had. I believe he said he would not work in that scenario. So, therefore, there was no scenario for him to work in.
>
> Q. What scenario are you talking about?
>
> A. He said he couldn't work that shift, if I'm not mistaken, with Abe, or he wouldn't put himself in that situation, or something like that. I'm trying to get it—wouldn't put himself in that position.

*Id.*, 37. Although Thompson asked plaintiff "if he would move," *Id.*, plaintiff indicated that he would not change shifts. *Id.*, 38.

---

9. McCullough was apparently referring to the evening of the last confrontation with Abe Jones: "When Mr. Yetts said that he would not report to Mr. Jones or do what he had to say, I said, 'Well, you know, if you're telling me you're refusing to do your job, I'll have to send you home.'" *McCullough Depo.*, 33.

10. Abe Jones denied, on deposition, that he was responsible for arguments with any other employees and testified that no employee other than plaintiff had ever used profanity towards him. *Deposition of Abraham E. Jones*, 16–17.

Plaintiff conceded on deposition that he had "been involved with confrontations with different individuals." *Plaintiff's Depo.*, 105. However, he believes that he was treated unfairly because Jones had been involved in similar confrontations with other employees, none of whom, so far as plaintiff knew, had been disciplined. *Id.*, 107.[10] He also believes that his two prior written warnings should not have been considered in connection with his termination because they related to safety issues, not personnel issues. *Id.*, 106–07. Finally, plaintiff believes that he was treated unfairly because Abe Jones had lied when he accused plaintiff of using profanity and when the company believed Abe Jones rather than plaintiff. *Id.*, 107.

Plaintiff also complains that similarly-situated white employees have been involved in similar misconduct but their jobs were not terminated.[11] According to plaintiff, Michael Scott White called Abe Jones a "fucking idiot." *Id.*, 83. Richard Lynch called Jones an "asshole." *Id.*, 84–85. Both Scott and Lynch were subsequently moved to different shifts. Larry Lewis told Abe Jones to "stay the fuck out of his area." *Id.*, 86.

Plaintiff also testified on deposition that Richard England, a white male, told his supervisor, Brad Neff, "This is fucking bullshit. Why do I have to do other people's work?" *Id.*, 89. After learning that Neff had gotten into his toolbox, Rick Blankenship said, "You keep your fucking hands out of my toolbox, you know, unless

---

11. The employees identified are Michael Scott White, Richard Lynch, Larry Lewis, Richard England and Rick Blankenship, all either machine operators or production associates. All these employees would be properly characterized as "Laborers," *Affidavit of Jerry Wilker*, ¶ 7, attached to *Defendant's Motion for Summary Judgment*, while plaintiff's position, *i.e.*, Millwright II, "involved maintenance on the machinery at the facility." *Id.* Although defendant argues that these employees are not comparable to plaintiff, the Court concludes, for purposes of this motion, that all the employees identified by plaintiff are comparable to plaintiff.

I give you the okay to do so." *Id.*, 89–91. Richard Lester, who supervised both employees, mediated this dispute, explaining to Blankenship that the production needs required the tools, but telling Neff that he should at least forewarn the employee. *Id.*, 91–92.[12]

■ Although plaintiff alleges at least one instance of confrontation with Abe Jones or another supervisor by different white employees, there is no evidence of repeated confrontations by any of these employees, as occurred in plaintiff's case. Nor has plaintiff presented evidence that any non-minority employee refused, like plaintiff, to work with a particular supervisor yet decline the opportunity to change shifts. In short, none of the white employees identified by plaintiff engaged in conduct of comparable seriousness to that of plaintiff. Under these circumstances, the Court cannot conclude that plaintiff has established that similarly-situated non-minority employees were treated dissimilarly to him.

Under these circumstances, the Court concludes that plaintiff has failed to establish his *prima facie* case of racial discrimination based upon circumstantial evidence.

### 2. Direct Evidence.

Attached to plaintiff's memorandum in opposition to the motion for summary judgment is the affidavit of Fred Specie, a former employee of defendant who also worked with plaintiff. According to Specie, a number of managers of the defendant used racially derogatory terms in referring to plaintiff. For example, Larry Thompson once said to Specie, "Fred, do you think this nigger is worth his weight in shit? I haven't seen any of them yet that was." *Specie Affidavit,* ¶ 6. Richard Lester, plaintiff's former cell leader, asked Specie on at least one occasion when looking for plaintiff, "Have you seen my fucking nigger anywhere?" *Id.*, ¶¶ 20, 21. When Specie reported the use of racial epithets to Kaye Fisher, of the Human Services Department, she refused to deal with the problem. *Id.*, ¶¶ 17—19.[13]

■ The allegations contained in the Specie affidavit, if credited, constitute direct evidence of a racially-biased state of mind on the part of at least some of plaintiff's supervisors and those who either disciplined plaintiff or participated in the decision to terminate his employment. If believed, this evidence requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's decision. *See Talley,* 61 F.3d at 1248. Where such direct evidence is presented, the analysis applicable to cases based on circumstantial evidence of discrimination is inapplicable. *Terbovitz v. Fiscal Court of Adair Cty.,* 825 F.2d 111, 114 (6th Cir. 1987) citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Instead, the case must proceed to trial for a determination whether the proffered direct evidence is credible; if it is, the burden of persuasion then shifts to the defendant to show that plaintiff would have been terminated notwithstanding the defendant's discriminatory motivation. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–5, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1081 (6th Cir.1994).

■ Defendant argues that Specie's assertions are inadmissible hearsay. While it is true that hearsay evidence, not otherwise admissible, may not be considered on summary judgment, *see Wiley v. United States,* 20 F.3d 222, 226 (6th Cir. 1994), the allegations made by Specie are proffered to establish—not the truth of the

---

12. Plaintiff also testified that Abe Jones was involved in a number of confrontations with other employees. *E.g., Plaintiff's Deposition,* 87–88. However, any failure on the part of the defendant to discipline Jones, who is also African–American, would not serve to advance plaintiff's *prima facie* case.

13. Although Specie's affidavit also referred to the use of racially offensive terms by other employees, none of those employees either supervised plaintiff or participated in the decision to terminate plaintiff's employment.

matter asserted—but the state of mind of the defendant's agents. The allegations are therefore not hearsay and are admissible. *See Jacklyn v. Schering–Plough Healthcare,* 176 F.3d 921, 925 (6th Cir. 1999).

▮▮ Defendant also argues that any racially-offensive remarks made by defendant's decision-makers were unrelated to the decision to terminate plaintiff's employment. Defendant relies on *Simmons v. Oce–USA, Inc.,* 174 F.3d 913 (8th Cir. 1999), for the proposition that racially derogatory remarks not temporally related to the adverse employment decision cannot be considered as direct evidence of a discriminatory motivation. In that case, however, the evidence consisted of racially charged language used two years prior to the plaintiff's termination. Characterizing the language as "stray remarks 'that are remote in time ...,'" the Eighth Circuit concludes that plaintiff had failed to either present direct evidence of discrimination or evidence of pretext for purposes of a circumstantial case of discrimination. *Id.* In the case presently before the Court, however, neither party has addressed, from an evidentiary standpoint, when the alleged derogatory remarks were made. This Court concludes that whether or not the remarks were actually made and, if so, whether there existed a causal connection between the remarks and the decisions to discipline or terminate plaintiff are genuine issues of material fact that preclude the grant of summary judgment on plaintiff's claims of race discrimination.

## II. *State Law Claim of Retaliation.*

In addition to his claims, under both federal and state law, that his employment was terminated on account of his race, plaintiff also claims that he was terminated in retaliation for having filed a workers' compensation claim, in contravention of Ohio's public policy. Defendant argues that this claim must fail as a matter of law.

▮▮ An Ohio statute, O.R.C. § 4123.90, prohibits employers from punishing employees who file workers' compensation claims. Plaintiff does not base his retaliation claim on the statute, however.[14] Instead, he asserts a common law tort claim, arguing that his discharge contravened the public policy of Ohio, as reflected in the statute. Defendant contends that the statute provides the exclusive remedy for a claimed retaliatory discharge and that Ohio law does not recognize the common law tort pursued by plaintiff in this action.

Defendant's argument, which the plaintiff has wholly failed to address, is an accurate statement of Ohio law prior to the Supreme Court's decision in *Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308 (1997). *See, e.g., Hyatt v. Neaton Auto Prods. Mfg., Inc.,* 103 Ohio App.3d 591, 593–94, 660 N.E.2d 529 (1995). In *Kulch,* the Ohio Supreme Court held that an at-will employee discharged in violation of Ohio's whistle blower statute may pursue a common law cause of action for termination in violation of public policy notwithstanding the existence of the statute. The Court reasoned that the whistle blower statute, which provides only limited remedies, was not intended by the General Assembly to be the exclusive remedy for an employee terminated in contravention of the public policy reflected in the statute. In *Livingston v. Hillside Rehab. Hosp.,* 79 Ohio St.3d 249, 680 N.E.2d 1220 (1997), the Ohio Supreme Court applied the reasoning of *Kulch* to a common law tort claim of age discrimination, notwithstanding the existence of a state statute prohibiting employment discrimination on the basis of age.

▮▮ The pertinent Ohio statute, O.R.C. § 4123.90, does not authorize the recovery of compensatory and punitive damages, nor does it authorize trial by jury. Applying the reasoning of the Ohio Supreme Court in *Kulch,* this Court concludes that the law of Ohio recognizes a common law tort claim of retaliatory discharge in contravention of the public policy reflected in § 4123.90. Defendant's motion for sum-

---

**14.** Indeed, it appears that a claim based on the statute would be untimely.

mary judgment is without merit in this regard.

**WHEREUPON** the Court determines that defendant's for summary judgment is without merit and it is therefore **DENIED.**