**Justin HALL, Plaintiff,**

v.

**ITT AUTOMOTIVE, Defendant.**

No. 3:04 CV 7142.

United States District Court,
N.D. Ohio,
Western Division.

March 22, 2005.

Thomas A. Sobecki, Toledo, OH, for Plaintiff.

Carrie L. Sponseller, John T. Landwehr, Toledo, OH, for Defendant.

## MEMORANDUM OPINION

KATZ, Senior District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 17). Plaintiff has filed a response (Doc. No. 24); Defendant has filed a reply (Doc. No. 30). The Court has jurisdiction to decide this matter under 28 U.S.C. § 1332. For the following reasons, Defendant's motion is denied.

### BACKGROUND

Defendant ITT Industries, Inc. ("ITT") hired Plaintiff Justin Hall ("Hall") to work as a millwright on September 10, 2003. Hall had previously worked at ITT from September 2002 through January 2003, when he quit because he heard layoffs were imminent. ITT requires all new employees to serve a sixty-day probationary period before they become members of the International Aerospace and Machinists Union ("the union"). Though Hall had completed the probationary period and become a union member during his first period of employment with ITT, when ITT rehired Hall it required him, like all new hires, to complete another sixty-day probationary period before rejoining the union. All of the events relevant to Hall's claims took place during his second probationary period, when he was not covered by the union's collective bargaining agreement.

On October 10, 2003, Hall began to feel sick while working at ITT. He claims he felt faint and nauseous and told his supervisor, Andrew Sobota, ("Sobota") that he would like to go home. Sobota wrote a note to the ITT Human Resources department stating that Hall had requested to leave work due to illness. Hall left work, but did not see a doctor or provide ITT with a doctor's excuse for his absence, which he conceded in his deposition was "unexcused."

On Monday, October 13, 2003, Hall injured his left index finger at work and was taken to the emergency room. He initiated a workers' compensation claim the same day. Hall underwent follow-up treatment during the next few days; his doctors instructed him to wear a splint that would keep his left hand in the air and to work only with his right hand.

Hall returned to work on Friday, October 17, 2003. After working for about four-and-a-half hours, he reported to his supervisor that he felt faint and that his finger hurt. Hall's supervisor that day, Steven Franz, wrote a note to Human Resources stating that Hall had requested to leave work early, and Hall went home. He submitted a doctor's excuse for leaving early on October 17th, and ITT deemed the absence "excused."

Hall claims that while supervisor Sobota had always been pleasant to him in the past, after Hall hurt his finger and filed a claim for workers' compensation benefits, Sobota became rude and unpleasant to him and required him to work with his injured hand, in violation of his medical restrictions. Hall claims he reminded Sobota about his medical restrictions, but Sobota still would not follow them.

Hall re-injured his left index finger at work on Thursday, October 30, 2003, when he lost his balance trying to remove a stuck tube from a machine and bumped his finger. He informed Sobota, who wrote a note to Human Resources indicating that Hall had requested to leave to have his finger evaluated. Hall left work to seek treatment.

In late October of 2003, ITT received the first of the bills for Hall's October 17th workplace injury. It is undisputed that ITT paid the bills.

ITT claims that on November 5, 2003, Sobota verbally reprimanded Hall for quitting work ten minutes early. Sobota claims he observed Hall with his coat on and his machine off at 10:50 p.m., in violation of ITT's work rule 2(f), "violation of rest period signals and wash up signals," and that he verbally warned Hall and a union employee with whom Hall was working that day, Louise Mocherman, not to quit before 11:00 p.m. Hall flatly denies these claims, testifying in his deposition that he did not quit work early on November 5, 2003 and did not receive a warning from Sobota. Sobota also claims that on November 6, 2003, he observed Hall away from his machine for at least fifteen minutes, talking with another employee, again in violation of work rule 2(f). Hall denies this as well, claiming he said "Hi" and "See you later" to another employee briefly on his way to and from the restroom. Sobota did not document the November 5 or the November 6 incident in writing until December 11, 2003, when ITT Human Resources asked him for an e-mail describing the occurrences.

On November 7, 2003, Hall was scheduled to work second shift, beginning at 3:00 p.m. Earlier that day, someone from ITT called Hall to tell him that his mother, who also worked at ITT, had taken ill at work and was being taken to the hospital by ambulance, and to ask him to bring his mother's medication to the plant. Hall took the medication to the plant and followed the ambulance to the hospital. Before his shift at ITT was to begin, Hall called ITT and told them he would not be at work that day, due to his mother's illness. Later that day, Justine Davenport ("Davenport"), ITT's Human Resources manager, called Hall and terminated his employment with ITT, citing his attendance and work-rule violations during the probationary period. The parties disagree on where Hall was when he received Davenport's call on his cellular phone: Hall claims he was at the hospital; Davenport claims that after she first inquired about Hall's mother's health, Hall informed her that he was at home.

There is also some confusion about who made the decision to fire Hall and when that decision was made. Sobota claims Davenport called him on the morning of November 6, 2003—before he allegedly observed Hall take an excessively long break—to inform him that Hall's probationary period was almost up and to ask about his work habits. Sobota claims he told Davenport that he had witnessed Hall quitting work early the previous night, that Hall's work was less efficient and more laid back than it had been during his first stint with ITT, and that he was more selective about taking overtime. Sobota testified in his deposition that Davenport told him during that conversation that ITT was going to fire Hall the next day. In

the December 11, 2003 e-mail Sobota wrote to Davenport, he reported a slightly different version of the November 6, 2003 phone call, in which he and Davenport mutually agreed during the call to terminate Hall's employment the next day. Davenport claims she met with David Day, the plant manager, and Brian Brown, the operations manager, after Hall called off on November 7, 2003, and that the three of them collectively agreed at that time to terminate Hall. In yet a fourth scenario, Brown claims that he, Davenport, and Sobota were the ITT employees involved in the decision to terminate Hall.

In any event, Davenport, the common denominator in each scenario, testified that ITT fired Hall because of the two work rule infractions on November 5 and 6, 2003, and, as stated on his written Notice of Termination, "excessive absenteeism." Davenport testified that the absenteeism referred to was the absence on November 7, 2003, the day Hall was fired, and the two "early outs" on October 10, 2003, the day Hall became ill at work, and October 17, 2003, the day he left early because his injured finger hurt.

The October 17th absence was excused because Hall submitted a doctor's excuse. The October 10th absence was not excused, despite Sobota's note to Human Resources, which constitutes merely a notification that Hall left early, not an approved excuse. Excuses notwithstanding, Davenport testified that ITT has a "no-fault" attendance policy for probationary employees, so excuses or reasons for absences are not considered when an employee's absenteeism during the probationary period is evaluated. She also testified that the decision to retain or terminate a probationary employee is "left to the discretion of the company and it's also based on their collective attendance record and performance during their probationary time." (Doc. No. 22, Davenport Dep., p. 38). When asked how many "early outs" an employee would need to accrue during the probationary period to be fired, Davenport replied, "[a]s I stated before, it's left to the discretion of the company." *Id.* at 43.

Plaintiff has submitted the affidavit of Dawn Andrews ("Andrews"), an ITT employee who had her probationary period the same time Hall had his first probationary period, beginning in September of 2002. Andrews states that she was informed by the then-head of ITT human resources, Bernie Stone, that a probationary employee could miss up to three days of work. Hall testified that Andrews did in fact miss more than two days when she had the flu during her probationary period. Hall testified he believed these absences were unexcused. Defendant has submitted the affidavit of Jennifer Storrs, a human resources coordinator at ITT, who states that at the time of Hall's second probationary period, ITT had no policy allowing probationary employees to miss up to three days.

Hall timely filed this lawsuit, claiming he was discharged in retaliation for filing a workers' compensation claim, in violation of Ohio Revised Code § 4123.90 and Ohio public policy. ITT has moved for summary judgment, claiming Hall has not made out a prima facie case of retaliation and, in any event, cannot show ITT's legitimate, non-discriminatory reason for firing him was pretextual. ITT additionally argues that Hall may not bring a claim for violation of public policy because Ohio Revised Code § 4123.90 provides an adequate remedy.

### Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25, 106 S.Ct. 2548. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2541, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Harris v. General Motors Corp.,* 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party." *Williams v. Belknap,* 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987)). However, " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,' " *Wiley v. U.S.,* 20 F.3d 222, 227 (6th Cir.1994) (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams,* 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Atchley v. RK Co.,* 224 F.3d 537, 539 (6th Cir.2000).

**B. Ohio Revised Code Section 4123.90**

Under Ohio Revised Code § 4123.90, an employer may not discharge an employee for filing a workers' compensation claim for an injury that occurred during the course of his employment with that employer. Ohio Rev.Code § 4123.90. Section 4123.90 does not, however, preclude employers from terminating employees for any lawful reason, including inability to do their jobs or absenteeism due to their workplace injury. *White v. Mt. Carmel Med. Ctr.,* 150 Ohio App.3d 316, 780 N.E.2d 1054, 1063 (2002); *cf. Coolidge v. Riverdale Local Sch. Dist.,* 100 Ohio St.3d 141, 797 N.E.2d 61, 65–66, 71 (2003) (hold-

ing that employers who fire employees receiving temporary total disability for absenteeism or inability to work violate Ohio public policy; failing to hold such conduct violates § 4123.90).

Hall has no direct evidence showing that ITT terminated him for filing a workers' compensation claim. Therefore, the Court analyzes his § 4123.90 claim under a framework mirroring that of many other employment discrimination claims based on circumstantial evidence. First, the Court must determine whether Hall has made out a prima facie case by showing: (1) that he filed a workers' compensation claim for an injury incurred in the scope of his employment with ITT; (2) that he experienced an adverse employment action; and (3) that there was a causal connection between the filing of the claim and the adverse action. *White,* 780 N.E.2d at 1064; *cf. Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 375 (6th Cir.1984) (setting out the similar prima facie case for a claim of retaliation under Title VII of the Civil Rights Act of 1964). If Hall meets that burden, the Court must determine whether ITT has articulated a legitimate, non-discriminatory reason for firing him. *Kilbarger v. Anchor Hocking Glass Co.,* 120 Ohio App.3d 332, 697 N.E.2d 1080, 1083 (1997). If ITT does so, the Court must determine whether Hall can establish that ITT's stated reason is pretextual and that the real reason ITT fired Hall was the filing of his workers' compensation claim. *Id.* Though the burden of production shifts back and forth between Hall and ITT under the framework, Hall at all times bears the burden of proving ITT acted with retaliatory intent. *Boyd v. Winton Hills Med. & Health Ctr., Inc.,* 133 Ohio App.3d 150, 727 N.E.2d 137, 140 (1999).

The Ohio Court of Appeals in *Boyd* explained that:

> The factors that a trier of fact may consider in determining whether there was retaliation include: "punitive action such as bad performance reports after the ... claim was filed, the length of time between the claim and the discharge, changes in salary level, hostile attitudes emerging, and whether legitimate reasons exist for the discharge."

*Id.* (quoting *Anschutz v. Dresser Indus., Inc.,* No. 3–90–8, 1991 WL 261828, 1991 Ohio App. LEXIS 6124 (Dec. 11, 1991)). However, "[i]f the company policy is neutral in its application, the correlation between the timing of the discharge and the claim is not sufficient to meet the burden of proof." *Metheney v. Sajar Plastics, Inc.,* 69 Ohio App.3d 428, 590 N.E.2d 1311, 1314 (1990). Evidence indicating that other, similarly situated employees were treated more favorably may indicate that the legitimate reason articulated by the employer is pretextual. *See Rauhuff v. Am. Fan Co.,* No. CA98–09–188, 1999 WL 527783, at \*6 n. 2, 1999 Ohio App. LEXIS 2857, at \*17 n. 2 (June 21, 1999).

■ Here, there is no dispute that Hall filed a workers' compensation claim and that ITT terminated his employment. Likewise, Hall has presented evidence from which a reasonable jury might infer a causal relationship between the claim and the termination, and can therefore make out a prima facie case of retaliation. First, Hall claims that immediately after he was injured and filed his claim, his supervisor, Andrew Sobota, became rude, hostile, and uncooperative with him, specifically requiring him to work with his injured hand, whereas before the claim Sobota had been pleasant.[1] Moreover, after Hall filed his

---

1. ITT argues that Hall's affidavit on this point contradicts his deposition, in which he did not disclose Mr. Sobota's alleged hostility when asked to reveal all facts he thought

supported his claim that ITT retaliated against him for filing a workers' compensation claim, and that Hall therefore should not be permitted to rely on his affidavit. ITT is

claim, Sobota gave Hall a bad performance review on the telephone to Davenport, and, viewing the facts in the light most favorably to Hall, as the Court must at this stage, Sobota invented two incidents of misconduct by Hall and reported them to Davenport, who certainly helped make the decision to fire Hall. Second, Hall notes the short amount of time between ITT's receipt of the medical bills for his workers' compensation injury and its termination of his employment. While the short duration of Hall's second period of employment with ITT and the coincidence of his termination with the end of his probationary period mitigate Hall's claims based on the timing of events, the timing is not entirely irrelevant. Moreover, the evidence showing that ITT allowed Dawn Andrews to be absent for several days while a probationary employee tends to indicate that ITT's probationary employee absenteeism policy was not neutrally applied. The timing of Hall's claim and termination remains part of the overall relevant factual background. Finally, Hall has presented evidence that some of ITT's claimed reasons for his termination, the work-rule violations, are false. The totality of these factual assertions provides sufficient evidence to establish Hall's prima facie case.

■ ITT has articulated a legitimate, non-discriminatory reason for Hall's termination, claiming it fired Hall because he committed two work-rule violations and had excessive absenteeism, consisting of "early outs" on October 10, 2003 and October 17, 2003. ITT claims it has a "no-fault" absenteeism policy, in which excuses are not considered when determining discipline for probationary employees. Though

Davenport did not mention it in her deposition when asked to name all the reasons ITT fired Hall, ITT now also claims, based on Sobota's evaluation of Hall's work habits, that Hall failed to meet ITT's work standards.

Though Davenport also cited Hall's absence on November 7, 2003 as one of the reasons ITT terminated Hall, ITT does not now appear to rely upon that absence, which in any case, occurred after Davenport made the decision to terminate Hall, if the facts are viewed in the light most favorable to Hall. ITT apparently does not rely on Hall's "early outs" on October 13 and 30, 2003, the days he actually injured his finger at work.

■ Hall has presented enough evidence to demonstrate pretext. First, Davenport testified that the company decides whether to terminate a probationary employee based on the employee's collective attendance record and work performance during the probationary period. Hall has presented evidence indicating that a portion of his collective attendance and work performance record—the two work—rule violations—was pretextual. Moreover, Hall has presented evidence showing ITT treated a similarly, albeit not identically, situated coworker who did not file a workers' compensation claim differently from Hall. Though Dawn Andrews underwent her probationary period one year earlier than Hall under a different Human Resources Manager, both Andrews and Hall were absent for several days during their probationary periods, yet ITT did not fire Andrews. Whether Andrews' or Hall's absences were excused means little, given

incorrect for two reasons. First, the cases cited by ITT, *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309 (6th Cir.1989) and *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir. 1986), hold that a party may not create an issue of fact by filing an affidavit contradicting his own prior testimony. Hall is not

attempting to create a factual dispute by submitting conflicting statements. Second, the Court will not penalize Hall, a non-lawyer, for failing, in the midst of his deposition, to appreciate the relevance of Sobota's alleged conduct to his legal claim regarding the actions of his employer.

ITT's "no fault" policy. It was still within ITT's discretion to allow Hall's absences as it did for Andrews. Andrews claims that ITT had a policy of allowing probationary employees three consequence-free absences; Jennifer Storrs' avers that ITT had no such policy when Hall was a probationary employee. The jury, and not the Court, must resolve that factual dispute.

Hall has established a prima facie case and presented evidence of pretext. There are genuine issues of material fact that must be resolved by a jury. ITT's motion for summary judgment on Hall's Ohio Revised Code § 4123.90 claim is denied.

### C. Ohio Public Policy

ITT urges the Court to dismiss Hall's claim that it violated Ohio public policy. ITT claims Ohio Revised Code § 4123.90 provides an adequate remedy to employees terminated for filing workers' compensation claims and that, therefore, Hall may not bring a claim in tort for wrongful discharge in violation of § 4123.90's public policy.

The Ohio Supreme Court, in *Greeley v. Miami Valley Maint. Contractors, Inc.,* 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), recognized that public policy warranted an exception to the doctrine of employment-at-will, and that an employee terminated in violation of a statute could sue his employer in tort for wrongful discharge in violation of public policy. *Greeley,* 551 N.E.2d at 986–87. Such claims came to be called "*Greeley* claims." *See, e.g., Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308, 319–20 (1997). *Greeley* claims may be premised on the violation of a "clear public policy," whether the source of the policy is a statute or another source. *Id.* at 321.

■ The elements of a *Greeley* claim were adopted by the Ohio Supreme Court in reliance on the analysis of Professor H. Perritt. *Id.* To establish a cause of action for wrongful discharge in violation of public policy, Hall must show that: (1) a clear public policy existed (the "clarity" element); (2) dismissal of employees in circumstances like Hall's would jeopardize the public policy (the "jeopardy" element); (3) ITT's dismissal of Hall was motivated by conduct related to the public policy (the "causation" element); and (4) ITT lacked an overriding business justification for Hall's dismissal (the "overriding justification" element). *Id.* "Clarity" and "jeopardy" are questions of law; "causation" and "overriding justification" are questions of fact. *Id.* The latter two elements are equivalent to the burden-shifting analysis described above for claims under Ohio Rev.Code § 4123.90. *See White v. Simpson Indus., Inc.,* No. 99–4182, 2001 WL 45240, at *5, 2001 U.S.App. LEXIS 707, at *14 (6th Cir.2001).

■ Hall easily meets the "clarity" element: Ohio Rev.Code § 4123.90, which prohibits employer retaliation for participation in the workers' compensation system, clearly demonstrates a public policy against the discharge of employees for filing workers' compensation claims and in favor of enabling workers to utilize the workers' compensation system without sacrificing their employment. Ohio Rev.Code § 4123.90; *see also, e.g., Hildebrecht v. Premier Mach. Prods., Inc.,* No.2000–L–086, 2001 WL 1497195, at *1–2, 2001 Ohio App. LEXIS 5204, at *4 (Nov. 21, 2001); *Boyd v. Winton Hills Med. & Health Ctr., Inc.,* 133 Ohio App.3d 150, 727 N.E.2d 137, 144 (1999). Despite the clarity of the public policy, the question of whether a claim based on violation of the public policy embodied in § 4123.90 meets the "jeopardy" element, and therefore whether a *Greeley* claim based on a violation of that statute is even cognizable is somewhat unsettled.

■ This Court normally applies the law of Ohio "in accordance with the then

controlling decision of the highest state court." *United States v. Anderson County, Tenn.,* 761 F.2d 1169, 1173 (6th Cir. 1985); *see also Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Where the Ohio Supreme Court has not ruled, this Court must ascertain from all the available data, including relevant dicta in related cases, Ohio Supreme Court rulings in analogous cases, and the rulings of Ohio appellate courts, how the Ohio Supreme Court would decide the issue. *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985). "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tenn. Eastman Co.,* 889 F.2d 1481, 1485 (6th Cir.1989). This rule holds true even where there is federal precedent predating the state intermediate court decision and holding to the contrary. *Hampton v. United States,* 191 F.3d 695, 701 (6th Cir.1999). Moreover, unpublished opinions of the Sixth Circuit are not binding authority, but can be persuasive. *Harper v. AutoAlliance Int'l, Inc.,* 392 F.3d 195, 205 n. 3 (6th Cir.2004).

The Ohio Supreme Court has never explicitly approved or disapproved of *Greeley* claims premised on the violation of § 4123.90. Prior to that court's 1997 decision in *Kulch,* other courts had generally refused to allow such claims, reasoning that *Greeley* only authorized claims where the statute giving rise to the public policy provided no meaningful civil remedies. *See, e.g., Anderson v. Lorain County Title Co.,* 88 Ohio App.3d 367, 623 N.E.2d 1318, 1322 (1993). Section 4123.90 allows courts to order that successful plaintiffs be reinstated, and to award back pay or lost wages, plus attorneys' fees. Pre-*Kulch* courts found these remedies adequate to redress the public policy violation and held

that plaintiffs could not premise *Greeley* claims on violations of § 4123.90. *Id.; Burress v. Sears,* No. C–1–95–110, 1995 WL 500874, at *2–3, 1995 U.S. Dist. LEXIS 22408, at *7–8 (S.D.Ohio July 18, 1995).

The Ohio Supreme Court held in *Kulch* that a plaintiff could premise a *Greeley* claim on a violation of Ohio's whistle-blower statute, Ohio Rev.Code § 4113.52, which provides that courts may order that employees retaliated against for reporting their employers' illegal conduct be reinstated and awarded back pay, attorneys' fees and costs, and, in some cases, interest. *Kulch,* 677 N.E.2d at 324. *Kulch* rejected the argument that a plaintiff may not premise a *Greeley* claim on the violation of a statute that itself provides civil remedies, holding that:

> [T]he civil remedies set forth in R.C. 4113.52 are not adequate to fully compensate an aggrieved employee who is discharged, disciplined, or otherwise retaliated against in violation of the statute.
>
> .    .    .    .    .
>
> The existence of other remedies, therefore, does not render the public policy exception moot.

*Id.*

After *Kulch,* Ohio appellate and federal district courts have routinely recognized *Greeley* claims premised on violations of § 4123.90. *Perrine v. MPW Indus. Servs., Inc.,* 213 F.Supp.2d 835, 848 (S.D.Ohio 2002) (citing *Boyd,* 727 N.E.2d at 144); *Yetts v. ITW–NIFCO, Inc.,* 50 F.Supp.2d 776, 784 (holding on the basis of *Kulch* and *Livingston v. Hillside Rehab. Hosp.,* 79 Ohio St.3d 249, 680 N.E.2d 1220 (1997), which recognized a common law tort claim for age discrimination, notwithstanding the age discrimination remedies provided by Ohio statutes, that a *Greeley* claim based on § 4123.90 could progress, since that

section did not provide for recovery of full compensatory or punitive damages, nor authorize trial by jury); *Sidenstricker v. Miller Pavement Maint., Inc.*, 158 Ohio App.3d 356, 815 N.E.2d 736, 741 (2004) (citing *Boyd*, among other sources), *discretionary appeal allowed*, 104 Ohio St.3d 1459, 821 N.E.2d 576 (2005); *Limbacher v. Penn–Ohio Coal Co.*, No.2001 AP 07 0065, 2002 WL 1232935, at *5, 2002 Ohio App. LEXIS 2814, at *19 (May 31, 2002) (citing *Boyd*); *Hildebrecht v. Premier Machine Products, Inc.*, 2001 WL 1497195 at *1–3, 2001 Ohio App. LEXIS 5204 at *4–7 (Nov. 21, 2001); *Kent v. Chester Labs, Inc.*, 144 Ohio App.3d 587, 761 N.E.2d 60, 65 (2001) (citing *Boyd*); *Boyd*, 727 N.E.2d at 144; *Rauhuff v. American Fan Co.*, No. CA98–09–188, 1999 WL 527783, at *6–7, 1999 Ohio App. LEXIS 2857, at *19–21 (June 21, 1999) (relying on *Kulch* and *Livingston*).

In 2003, the Ohio Supreme Court held that employees who had filed a claim for Temporary Total Disability ("TDD") and who had been fired not for filing their workers' compensation claim but instead for excessive absenteeism due to their on-the-job injury could bring a *Greeley* claim premised on the public policy embodied in Ohio Rev.Code § 4123.56, the TDD statute, and § 4123.90. *Coolidge v. Riverdale Local Sch. Dist.*, 100 Ohio St.3d 141, 797 N.E.2d 61, 70–71 (2003). In so holding, the court appeared to countenance *Greeley* claims premised on retaliation for filing workers' compensation claims as well, remarking:

A claim of wrongful discharge in violation of public policy, whether based on workers' compensation or other law, originated, and is generally conceived [of] in Ohio and elsewhere, as an exception to the employment-at-will doctrine. *Id.* at 64.

Nevertheless, in 2004, the Sixth Circuit, in an unpublished opinion, refused to allow a plaintiff to press a *Greeley* claim premised on a violation of § 4123.90. *Jakischa v. Cent. Parcel Express*, 106 Fed.Appx. 436, 439–441, 2004 WL 1987131, *3–4 (6th Cir.2004). *Jakischa* noted *Kulch* but did not cite to *Coolidge*, and based its decision on the Ohio Supreme Court's 2002 decision in *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 773 N.E.2d 526 (2002). The court in *Wiles* held that a plaintiff could not premise a *Greeley* claim on the employer's violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54, even though the FMLA did not provide for punitive damages or damages for emotional distress, because the FMLA would allow the plaintiff to place himself in the same position he would have been but for the statutory violation. *Wiles*, 773 N.E.2d at 531–32.[2] *Jakischa* found the same could be said about the remedies provided by § 4123.90, and therefore found no reason to allow the public policy claim. *Jakischa*, 106 Fed. Appx. at 440, 2004 WL 1987131 at *3. A month after it issued *Jakischa*, and without citing that case, the Sixth Circuit, in another unpublished opinion, appeared to recognize a § 4123.90 *Greeley* claim, rejecting it only for failure to follow procedural requirements and for lack of evidence, not because such claims are not allowed. *Covucci v. Serv. Merch. Co.*, No. 98–3823, 115 Fed.Appx. 797, 799–801, 2004 WL 2367970, at *3–4 (6th Cir. October 20, 2004).

---

**2.** The court in *Wiles* pointed out that the *Kulch* opinion was a plurality opinion, with Justice Pfeifer concurring in the syllabus and judgment only, and thus was not controlling authority. *Wiles*, 773 N.E.2d at 534. However, Justice Pfeifer, evidencing a keen sense of irony, concurred in the judgment only in *Wiles* also, making it a plurality opinion as well. *Id.* at 535.

■ This Court is not bound by the unpublished opinion in *Jakischa,* and may not disregard the half-dozen Ohio appellate cases cited above holding that *Greeley* claims premised on a violation of § 4123.90 are cognizable, unless convinced that the Ohio Supreme Court would decide otherwise. For several reasons, the Court is not so convinced. First, § 4123.90 more closely resembles Ohio Rev.Code § 4113.52, the state anti-retaliation whistle-blower statute *Kulch* held inadequate to effectuate the public policy that it embodies, than it does the FMLA, a complex and comprehensive federal statutory scheme. Second, the Court finds the dicta of the majority of the Ohio Supreme Court in *Coolidge,* which seems to recognize the very claim at issue here, to be more persuasive than the earlier, plurality opinion in *Wiles.* Hall has satisfied the "jeopardy" element.

■ As described above in detail, Hall has set out a prima facie case and presented evidence that ITT's stated legitimate, nondiscriminatory reason is pretextual, thus showing that summary judgment in favor of ITT on Hall's § 4123.90 claim is inappropriate. The "causation" and "overriding justification" elements of Hall's *Greeley* claim mirror the burden-shifting analysis for his statutory claim, set out above. Therefore, for the reasons set out above, Hall has met the "causation" and "overriding justification" elements. ITT is not entitled to summary judgment on Hall's claim for wrongful discharge in violation of public policy.

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 17) is denied.

IT IS SO ORDERED.

*JUDGMENT ENTRY*

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Defendant's Motion for Summary Judgment (Doc. No. 17) is denied.